## P. E. Sharpless Co. v. Levin et al., trading as Levin Brothers.

*Trade-marks—Infringement—Unfair competition—Similarity of labels— Deception of ultimate consumer — Test of infringement — Account refused where plaintiff is tardy in filing bill.*

1. The fundamental principle underlying the infringement of trade-marks and unfair competition is that no person may simulate the mark or label constituting the *indicia* of his rival in trade, whereby he or his vendee is enabled to practice deception by passing off his goods directly or indirectly as those of his rival, and so work a fraud upon him and upon the public.

2. The resultant effect of the respective labels to confuse and mislead is to be measured and ascertained by the probable effect on purchasing consumers of the product, and not whether jobbers or retailers familiar with both products are readily able to distinguish between them; a manufacturer is guilty of unfair competition if, by the similarity of his label to that of his competitor, he puts it in the power of his retailers to mislead purchasing consumers.

3. Although intent to deceive, *i. e.*, fraud, must be established in cases of unfair competition, it is not necessary to prove actual deception where there is a degree of similarity calculated to deceive an ordinary purchaser buying with ordinary caution, because the intent to deceive may be inferred from the nature of the act.

4. In testing what is or what is not a similar label, the court need not depend upon elaborate descriptions of the points of resemblance or those of difference, but should decide by the impression created by the label on the ear or· eye or both, thus deciding the question on the same basis as the purchaser who, in the ordinary course of trading, is called upon to judge as to the identity of the defendants' label. The test of identity is not whether a difference is recognized when the two competing articles are placed side by side, but whether it will be recognized by a purchaser not having an opportunity to compare them. Such similarity as will deceive is that likeness which renders the average buyer unable to distinguish the defendant's label from the memory of the plaintiff's label which he carries in his mind, not such as will enable him to know them apart when the two are put side by side before him.

5. Where plaintiff has been tardy in applying for relief against an infringement of his trade-mark or against unfair competition, he is not entitled to an account from the defendant.

6. Since 1907 plaintiff had been engaged in producing, manufacturing and selling dairy products, including a grade of soft cheese, made from whole milk, packaged and sold by it under the title of "Neufchatel Style;" this cheese contained 20.70 per cent. butter fat and acquired a high reputation. Plaintiff sold the cheese in small cylindrical rolls, enclosed in tin-foil wrapping, on which was printed in blue ink a rectangular label the length of the roll, purporting to indicate the character of the contents. Plaintiff's label had been the same since 1907, except that it adopted and had used since March, 1913, the word "Pesco" in substitution for a picture of a cow; in all other respects the original and modified labels were identical. Plaintiff's cheese was sold largely in South Philadelphia, among Jews and Poles who could not read English. In 1913, defendants began to sell, at No. 115 Pine Street, a soft cheese, packaged and labeled as "Neufchatel Style." This cheese contained 11.16 per cent. butter fat; was wrapped in packages of the same size and shape as plaintiff's, and bore a label, printed in blue ink, which produced the impression of close resemblance to plaintiff's label and could easily be mistaken for it by the consuming purchaser, although entirely distinct to jobbers and dealers. It should be noticed that, whereas plaintiff's trade-mark had the name of the maker at the top, defendants' trade-mark did not disclose the maker and merely had "Guernsey Brand;" the word "Cremo" was used instead of the word "Pesco;" the words "Made Daily" were on both labels, having much the same slant from the perpendicular. Plaintiff's mark indicated that the cheese was made at Concordville, Pa., the defendants' mark merely indicated that their cheese was made in Pennsylvania. The words "Neufchatel Style" were the same in both. Plaintiff discovered the infringement in 1915. On bill filed by plaintiff on June 24, 1919, to enjoin defendants from further use of the label they had adopted, or in any other manner imitating substantially the mode of packing adopted by plaintiff, and that defendants be decreed to account for profits: *Held*, that plaintiff was entitled to an injunction, but not to an accounting, as it had been tardy in filing its bill.

Bill, answer, replication and proofs.   C. P. No. 5, Phila. Co., June T., 1919, No. 2323, in Equity.

*M. Herzberg* and *H. T. Fenton,* for plaintiff.

*Evans, Forster & Wernick,* for defendants.

MONAGHAN, J., Oct. 24, 1921.—The plaintiff, P. E. Sharpless Company, a corporation, filed its bill in equity June 24, 1919, charging the defendants, Levin Brothers, with unfair competition in the sale of Neufchatel cheese, by means of an imitative and deceptive label; the defendants filed an answer denying the unfair competition. A replication was duly filed and the cause was heard on bill, answer, replication and proofs. After the close of the plaintiff's case the defendants offered no testimony.

The prayers of the bill are that the defendants and each of them, and their servants, agents and employees, be restrained from any further use in unfair competition of their label (Exhibit "B"), or any substantially similar thereto, now used by them in fraudulent imitation of plaintiff's label (Exhibit "A"), or in any other manner imitating, substantially, the mode of packing so-called "Neufchatel" cheese in cylindrical packages of tin-foil with the aforesaid label printed thereon in blue ink; that defendants be decreed to account; general relief.

*Findings of fact.*

1. The plaintiff corporation is the successor in business of P. E. Sharpless & Co. and its predecessors, and is now and has been, since its incorporation in 1904, engaged in the business of producing, manufacturing and selling dairy products, including, since 1907, a grade or type of soft or uncured cheese, made from whole milk and packaged and sold by it under the name or title of "Neufchatel Style," and by the general trade as "Neufchatel." Said product has always been made and packaged by the plaintiff corporation at Concordville, Pennsylvania.

2. Soft or uncured cheese, when made from whole milk, as distinguished from skim milk, contains a relatively larger percentage of butter fat, and is, for that reason, commercially identified and graded in the general trade as "Neufchatel."

3. The nutritive value and keeping quality of soft, uncured cheese, made from milk, depend upon its greater or less percentage of butter fat content.

4. The plaintiff has established a large business in the product in question, and has acquired a reputation for its good quality, which it maintains at a high standard of butter fat content.

5. The defendants, since 1913, sell at their establishment, No. 115 Pine Street, Philadelphia, a soft or uncured cheese, packaged and labeled as Neufchatel style.

6. Both plaintiff and the defendants package their products in small cylindrical rolls, of substantially the same size, enclosed in tin-foil wrapping, on which is printed in blue ink a rectangular-shaped label the length of the roll, the label purporting to indicate the character of the contents. The respective labels of the two parties, as they appear on the cheese packages produced in evidence, are correctly shown (except as to the blue color of the printing) in the photographic Exhibits "A" and "B" annexed to the bill of complaint.

7. Plaintiff's tin-foil wrapper, including the label printed thereon, has been the same as shown in Exhibit "A" since 1907, except that in March, 1913, it adopted and used thereon and since the word "Pesco" in substitution for a pictorial representation of a cow in the same place on the label. In all other respects the plaintiff's original and the modified label (Exhibit "A") were

1 D. & C.

identical. The modified label (Exhibit "A") is not in substantial variation of the original label used by plaintiff from 1907 until 1913.

8. Plaintiff's tin-foil wrappers, including the label printed thereon, were made for it by Lehmaier, Schwartz & Co., No. 211 East Twenty-second Street, New York City. Defendants' tin-foil wrappers, with the label printed thereon, were obtained by them from the same person and place.

9. Plaintiff was the first and continues to be the only user of the descriptive title "Neufchatel Style," except and until the defendants entered the field, about 1913, and used the same words on their label until the present.

10. The cheese product of the plaintiff, sold under its original label of 1907 and the modified label of March, 1913, averages 20.70 per cent. butter fat content. The cheese product sold by the defendants under their label since 1913 is of approximately 11.16 per cent. butter fat content.

11. Plaintiff's label on its product, Neufchatel cheese, by the year 1913 had become so associated with it that the public, from its label, whether in the original or modified form, identified it as the product of the plaintiff.

12. The plaintiff sells its said cheese product mainly to jobbers at wholesale, with occasional sales to retailers and consumers, and has a large jobbing trade for it in the southeastern section of the City of Philadelphia.

13. The retail sales to consumers, of the products of both parties litigant, in the southeastern section of Philadelphia are largely to Jewish and Polish consumers, many of whom are incapable of reading.

14. Plaintiff's sales of its said cheese so wrapped and labeled (Exhibit "A") has materially decreased since the defendants entered the market with their cheese product wrapped and labeled as shown in Exhibit "B."

15. Several jobbers or storekeepers who formerly bought and still purchase from the plaintiff its cheese product so wrapped and labeled (Exhibit "A") now buy from defendants their product so labeled (Exhibit "B"), and at a price much below plaintiff's price, though retailing it to consumers at the same price in some instances.

16. The sole features of exact non-identity in the respective labels of the parties litigant are: On plaintiff's labels is printed "P. E. Sharpless Co." at the extreme top; in the centre appears the capital letters forming the word "Pesco" on the present or modified label (in the original label appeared a picture of a cow occupying the same relative position as the word Pesco), with the words "Trade Mark" in smaller type beneath, and the words "At Concordville" preceding the abbreviation "Pa." On the defendants' label, at the extreme top is printed "Guernsey Brand;" the word "Cremo" in the centre, in capital letters, with a few short printer's decorative lines beneath the word; a scroll appears in the upper portion of the label to the left of the centre.

17. The words "P. E. Sharpless Co." and "Guernsey Brand" are in a relatively inconspicuous place on the respective labels. "Guernsey Brand" is suggestive of the picture of the cow, contained in plaintiff's original label, and at the same time this inscription on the defendants' label visually fills in the same space occupied by "P. E. Sharpless Co." in plaintiff's original and modified labels. Each inscription contains thirteen letters, and the type used in each label is of very nearly the same size, and when observed at a short distance therefrom are of somewhat similar appearance.

18. The words "Cremo" on the defendants' label and the picture of the cow on the plaintiff's original label, side by side, are not the same; but at a distance, or when the respective products labeled with the original label of the plaintiff and the word "Cremo" of the defendants, respectively, are inter-

spersed in a box in which the products are packed, the difference can be detected only upon close examination.

The words "Pesco" in the plaintiff's modified label, and "Cremo" on the defendants' label, each consists of the same number of letters and the same terminal letter, occupying the same relative position on each label. Examined side by side, the two words are non-identical, but combined with the other features of the label there is, when observed at a distance, a general resemblance. When packed in the boxes used by both parties, the labeled goods of the defendants interspersed with the labeled goods of the plaintiff, the difference between the packages marked "Cremo" and those marked "Pesco" can be detected only by a close examination.

19. The idea or message conveyed by the plaintiff's labels, to wit, "Cheese"— "Neufchatel Style"—"Made Daily"—"At Concordville, Pa."—is in effect the same as "Cheese"—"Neufchatel Style"—"Made Daily"—"In Pennsylvania"— on the defendants' label. The collocation of the words and phrases is the same; the arrangement of the words and phrases on the labels, and the character of type used, is strikingly similar.

20. The defendants' name, nor their place of business, does not appear on their label.

21. The sole features of exact identity in the respective labels of the parties litigant are: the words "Cheese"—"Neufchatel Style"—"Made Daily"— "Net weight 2½ ounces." The location of these words and the style of the letters is substantially identical. The words descriptive of where made, to the right of the labels, are also substantially identical in appearance and idea. There is also an exact identity in the shape of the labels, the lines forming the border thereof, and the color of the printing thereon.

22. The features of exact identity in the labels of the respective parties, due to their obvious meaning, are materially characteristic and identifying features, being printed, collocated and arranged in substantially the same way, and are important in determining and establishing substantial identity as a whole.

23. The feature of substantial identity, as a whole, of the respective labels, *i. e.*, plaintiff's original and modified labels and the defendants' label, due to the use in each of the apparent features of exact identity, emphasized and made effective by the pronounced similarity in the collocation and arrangement of them on the respective labels, is sufficient to *prima facie* establish that they had a common origin, and puts the burden on the defendants to rebut that conclusion.

24. An ultimate conclusion of substantial similarity of the respective labels, sufficient to probably confuse and mislead purchasing consumers, is found as a fact here from the primary fact that both labels contain characteristic features of exact identity, emphasized and made effective by the same substantial collocation and arrangement of them, and by the similarity in the appearance of the labels and of the ideas conveyed, especially in the absence of any proof rebutting the necessary inference and probable result.

25. The defendants were not *bona fide* appropriators and users of their label prior to either the original or the modified label of the plaintiff.

26. The defendants, coming into the field after the plaintiff, did not sufficiently differentiate their label from either the original or modified label of the plaintiff. The imitation of plaintiff's labels was not necessary for any useful or proper purpose.

27. It is evident to the court that the label of the defendants is so substantially similar to both the original and the modified labels of the plaintiff that

1 D. & C.

it is calculated to deceive the ordinary purchaser, buying with ordinary caution, and we, therefore, infer and find, in the absence of any explanation or defence on the part of the defendants, or otherwise, that by the use of their label on their inferior product defendants intended to deceive the public and to pass off their goods for and as the superior product of the plaintiff; and, further, that the defendants' conduct by the use of their label tended to confuse the products of the plaintiff and of the defendants in the market.

28. The plaintiff was tardy in its application for relief.

29. The plaintiff has not proved any specific loss of profits or damage.

## Discussion.

The bill was filed to restrain unfair trade and competition. P. E. Sharpless Company, the plaintiff, a corporation, has been engaged since 1907 in the manufacture and sale of dairy products at Concordville, Pennsylvania. For the past twenty years or more traders in cheese have been manufacturing and selling what has been commonly known as "Neufchatel" cheese. This is not, however, the genuine "Neufchatel" cheese, which is a foreign product manufactured in France, but a domestic preparation of soft or uncured cheese, made from whole milk. There are a number of grades of the domestic "Neufchatel" cheese, the grade being determined by the proportion of butter fat content; the greater the percentage of the butter fat content making for a more nutritive and lasting quality and commanding a higher price in the market. In 1907 the plaintiff, recognizing that if it sold the domestic "Neufchatel" cheese under the title "Neufchatel," they probably would come in conflict with the law, adopted as a trade name for its preparation "Neufchatel Style," which it applied to a preparation of soft or uncured cheese from the whole milk, and containing a butter fat content approximating 21 per cent. In preparing this cheese for the market the plaintiff made it into small cylindrical rolls, wrapped interiorly with thin paper, exteriorly with tin-foil, and placed twenty-five of the rolls in a box. Manufacturers and traders in cheese had been and still are wrapping and packing their products for the market in the same manner. It also appears that the traders generally had their labels printed on the tin-foil covering of each roll. In order to identify its particular product in the market, the plaintiff adopted a distinctive label in 1907, which it caused to be printed on the tin-foil wrapper heretofore described. On this label appeared in bold type along the top "P. E. Sharpless Co.;" on the line immediately beneath, in prominent type, the word "Cheese;" in the centre of the label was a pictorial representation of a cow; on the left of the picture of the cow were the words "Made Daily," each word on a separate line and running diagonally upward and inward; to the right of the picture of the cow were the words "At Concordville, Pa.;" each of these three words on a separate line, the words "At" and "Concordville" extending diagonally outward and upward from the central picture on the label; the abbreviation "Pa." was on a horizontal line immediately beneath and to the side of the other two words; in large, bold type, extending horizontally along the base of the label were the words "Neufchatel Style." Printed on the tin-foil beneath the lower boundary line of the rectangle, in very small letters, were the words "Net weight 2½ ounces." The label was enclosed by a rectangular rule-line border. All the printing was in blue ink.

From 1907 until 1913 the plaintiff manufactured and sold a superior domestic "Neufchatel" cheese, of approximately 21 per cent. butter fat content, packed, wrapped and labeled as above set forth. Its product thus labeled became identified in the market as the product of the plaintiff. In March, 1913, the

plaintiff modified its label by the substitution of the word "Pesco" for and in place of the picture of the cow; otherwise the label was identical with the original, and the plaintiff continued to sell its product under the label so modified until the present time.

Sometime in 1913 the defendants engaged in the business of manufacturing and selling a dairy product made of soft or uncured cheese, of approximately 11 per cent. butter fat content. They prepared their product in cylindrical rolls of the same size and shape as that of the plaintiff. Each roll was wrapped interiorly with thin paper, exteriorly with tin-foil, and twenty-five rolls were packed in a box of the same shape and size as that used by the plaintiff. When about to place their product on the market, they had a label designed and printed by a firm of printers in New York City, for the purpose of affixing to their goods, which they have manufactured and sold with labels of that design printed on the tin-foil wrappers since 1913 to the present time. It may be a coincidence that the printers who furnished the labels to the defendants were the same concern which supplied the plaintiff with its label. Along the top of defendants' label appears "Guernsey Brand" in bold type, differing in the words from "P. E. Sharpless Co." appearing on plaintiff's label, but containing the same number of letters and similarly situated; the word "Cremo" was printed in the centre of defendants' label in large type; the words "Made Daily" appear on the defendants' label in the same location that the same words occupy on the plaintiff's label; the type bears a marked resemblance to that used by the plaintiff, and the direction of the words is substantially the same as those on the plaintiff's label; to the right of the word "Cremo" appear the words "In Pennsylvania," each word occupying a line, with a scroll beneath the last word; these three inscriptions appear in the same space on the label as the words "At"—"Concordville"—"Pa."—occupy on the plaintiff's label, producing, when not critically examined, a marked similarity. Extending horizontally along the lower part of the defendants' label is printed "Neufchatel Style" in prominent type, containing the very same letters, the character and style of the type being but slightly different from the like inscription on the plaintiff's label. The defendants' label is also bounded by a rectangular border of ruled lines, and immediately beneath the lower line of the rectangle are printed the words, in very small type, "Net weight 2½ ounces." The entire label of the defendants is printed in blue ink on the tin-foil wrapper of each roll of cheese.

That the defendants knew of the plaintiff's original label at the time they caused theirs to be designed, adopted and used in the sale of their inferior product is clear, for the defendant, Jacob Levin, testified that the plaintiff was using the picture of the cow on its label when the defendants commenced using theirs. The defendants also knew, or should have known, that plaintiff's goods at this time were identified in the market by reason of the use of its label thereon.

If the defendants' label is so similar to the plaintiff's labels that it is probable it would result in deception or in the passing off of the goods of the defendants' for the plaintiff's, or result in confusion of the product on the market, the defendants have brought about a condition of unfair competition which it is the duty of the court to restrain. In deciding as to what is, or is not, a similar label, the court need not depend upon elaborate description of the points of resemblance or those of difference, but should decide by the impressions created by the label, on the ear or eye, or both, thus deciding the question on the same basis as the purchaser who, in ordinary course of trading, is called upon to judge as to the identity of the defendants' label. It

1 D. & C.

should be said here, also, that the buyer usually has not a chance of trial by side-by-side comparison. The test of identity is *not* whether a difference is recognized when the two competing articles are placed side by side, but whether it will be recognized by a purchaser when *not* having opportunity to compare. Such similarity as will deceive is that likeness which renders the average buyer unable to distinguish the defendants' label from the memory of the plaintiff's label which he carries in his mind, not such as will enable him to know them apart when the two are put side by side before him: See Liggett & Myers Tobacco Co. *v.* Finzer, 128 U. S. 182; McDonald Manuf. Co. *v.* Mueller Manuf. Co., 183 Fed. Repr. 972; Nims on Unfair Competition, § 322.

A comparison of the labels of the plaintiff with that of the defendants shows an almost exact identity in the size and shape of the label, a marked resemblance in the size and shape of the type occupying relative positions on the label, in the collocation of the general features, in the color of the ink, and in the exact repetition of the words "Cheese" —"Made Daily"—"Neufchatel Style" and "Net weight 2½ ounces."

On the other hand, there are two features on the defendants' label which appear at first to be precisely non-identical with any inscription on the plaintiff's labels, to wit, "Guernsey Brand" and "Cremo." The words "Guernsey Brand," however, give rise to an impression similar to that emanating from the picture of the cow on the plaintiff's original label. It must be borne in mind that the ordinary purchaser, by mail or in a shop, has little opportunity to compare the plaintiff's goods with those of the defendants'. He has one article before him, and, usually, the best he can do is to compare it with his memory of the other.

"It is not necessary that the resemblance produced should be such as would mislead an expert, nor such as would not be easily detected if the original and the spurious were seen together:" Shaw Stocking Co. *v.* Mack, 12 Fed. Repr. 707.

"The test of similarity is not visual comparison, but memory comparison:" Nims on Unfair Competition, § 326.

Therefore, in considering whether the defendants' label is so similar to the plaintiff's as to lead the ultimate consumer, notwithstanding the exercise of ordinary care, to mistake the product sold under the one label for the product sold under the other label, we must bear in mind not only those visual characteristics which remain in the memory as a direct appeal to the eye, but also such impressions or suggestions directly arising out of the characteristics, which would probably remain in the memory as an appeal to the ear. The memory of a picture on a label may remain in the purchaser's mind, not as a concrete picture, but as an impression or suggestion in the nature of some catchy, descriptive, spoken word, appealing to the ear rather than to the eye, and ordinarily directly suggested by such picture. So, too, letters, words or inscriptions on a label may dwell in the purchaser's memory, not merely as they are printed, but as an impression of a concrete picture suggested by the words. A person desiring to imitate a label, on which is imprinted a picture, could succeed in confusing the memory of the ordinary ultimate customer by inserting in the imitating label an inscription usually suggested by the picture or suggestive of the picture. The picture of a cow on a label would directly suggest the words "cow" or "cow brand" to a purchaser. After a lapse of time, the party who has purchased the original product with the label containing the picture probably has forgotten the picture, and retained in his memory the impression by way of the words suggested; and the appearance of "Guernsey Brand" on the label of the product he is about to buy would

probably satisfy his mind that the product is the "cow" brand which he had formerly purchased. Though "Guernsey Brand" and the picture of a cow are visually non-identical, the suggestion arising from their use is markedly similar.

It is only on a separate examination of the word "Cremo," printed on the centre of the defendants' label, that it maintains the distinction of exact non-identity with anything on the plaintiff's original or modified label. We must, however, consider that the ultimate purchaser of the small package, such as the parties litigant vend, would probably not notice at a short distance from the packages the difference between the picture of the cow or the word "Pesco" and this word "Cremo," the identity of each being merged in the general similarity of the labels, the general collocation of the features thereon, and the almost exact indentity in make-up and in the repetition of a number of the inscriptions. Further, upon an ordinary examination of a box containing twenty-five packages of cheese, packed, wrapped and labeled as the parties in this case sold their products, with the labeled goods of the plaintiff and of the defendants interspersed in the box, it is difficult to distinguish the product of the defendants from that of the plaintiff. The distinction can be made with surety only upon close examination. If the box containing the plaintiff's product were at some considerable distance from the customer, as, for instance, where the box is on the shelf and the customer in front of the counter, it would probably be hard to determine whether the central figure of the defendants' label was a picture or a word. The use of the word "Cremo," therefore, on the defendants' label, considering the method of sale of the small articles vended by the parties, would not tend to differentiate defendants' product from that of the plaintiff, but rather tend to confusion and deception.

The message of the plaintiff's labels to the public is "P. E. Sharpless Co."—"Cheese"—"Neufchatel Style"—"Made Daily"—"At Concordville, Pa."—"Net weight 2½ ounces." The message conveyed by the defendants' label is "Guernsey Brand"—"Cheese"—"Neufchatel Style"—"Made Daily"—"In Pennsylvania"—"Net weight 2½ ounces."

"Guernsey Brand," upon one phase of the significance of which we have already commented, is in the same place on the defendants' label as is occupied by the name "P. E. Sharpless Co." on the plaintiff's label; the defendants nowhere on their label show the name of the owner or the origin of their product. The absence of the latter on the defendants' label does not serve to differentiate from that of the plaintiff, but rather to confuse, since it is common knowledge that persons who buy goods frequently never know the names of the makers, or, if they ever did, have forgotten them. "Guernsey Brand," consisting of the same number of letters as contained in the plaintiff's name, serves to cover the like space and gives the general appearance of an inscription of the plaintiff's name, with which many purchasers, relying upon the general likeness of the label, have never concerned themselves, or may have forgotten. The use of the words "Guernsey Brand" serves to confuse rather than to differentiate the labels in the minds of ultimate consumers.

The remainder of the message to which we have referred, "Cheese"—"Neufchatel Style"—"Made Daily"—"In Pennsylvania," on defendants' label, conveys the same idea in almost exact words and in almost exactly identical type, in the precise location of the same words on the plaintiff's labels. The use of these words by the defendants in almost exact similitude, make-up and idea conveyed to those on the plaintiff's labels discloses the evident purpose of the defendants.

1 D. & C.

Plaintiff, since 1907, has used the particular words "Neufchatel Style" to denote the superior quality of Neufchatel cheese manufactured and marketed by it. While the words may have been descriptive originally and could have been used by the trade generally, it was testified they were not so used by the trade, and that evidence has not been contradicted. Other traders used other words in desccribing cheese of this grade. In 1913 the labels of the plaintiff, containing the dominant inscription "Neufchatel Style," had been identified as the plaintiff's product on the market. The defendants knew, or should have known, when they engaged in the manufacture and sale of their cheese in 1913, that their product was 50 per cent. the inferior of the plaintiff's goods—certainly in quality, and probably in price. When the defendants used their label, similar in many distinctive features to that of the plaintiff, and containing thereon the same words, "Neufchatel Style," in imitative type, without anything upon the label to differentiate it materially from the label of the plaintiff, their purpose in so doing could not be honest. Their representation in this regard was not only deceptive, but it was false, in that they were knowingly informing the public that the inferior product was the "Neufchatel Style," theretofore identified in the market as the plaintiff's product.

It was said in The American Waltham Co. *v.* United States Watch Co., 173 Mass. 85: ". . . It is pretty well settled that the plaintiff, merely on the strength of having been first in the field, may put later comers to the trouble of taking such reasonable precautions as are commercially practicable to prevent their lawful names and advertisements from deceitfully diverting the plaintiff's custom." And in Pennsylvania Central Brewing Co. *v.* Anthracite Beer Co., 258 Pa. 45, the court held that "A dealer coming into a field already occupied by a rival of established reputation must do nothing which will unnecessarily create or increase confusion between his goods or business and the goods or business of his rival."

Any artifice, device or peculiarity of arrangement adopted by the defendant which tends to increase the probability of deception, and which is not necessary for any useful or proper purpose, will be enjoined. An absolutely false use of words or names cannot be necessary for any honest purpose. Such false use is a deceptive artifice. Accordingly, where the similarity and resulting confusion are caused by any false statement or suggestion made by the defendant in connection with his goods or business, a clear case for injunction is presented. No falsity will be permitted: 38 Cyc., 795.

That there is a striking resemblance between the labels of the plaintiff, not only in printed features, but also in the similar impressions and suggestions and ideas arising therefrom and the label adopted by the defendants in 1913 is clear. The imitation by the defendants of the words "Cheese"—"Neufchatel Style"—"Made Daily"—"At Concordville, Pa."—is palpable. The defendants' purpose in adopting and using on their inferior product, without sufficient differentiation, such a strikingly similar label, with the false representation "Neufchatel Style" thereon, was obviously to place it within the power of the retailers to palm off on the ultimate consumer their cheaper and inferior goods as and for the superior goods of the plaintiff.

It may be contended by the defendants that a number of the elements of the plaintiff's methods of preparing and packing cheese were, and are now, in use by traders generally for a similar purpose. For instance, the size and shape of the box, the size and shape of the roll, the manner of wrapping interiorly with thin paper and exteriorly with tin-foil, and perhaps the printing with blue ink of the label on the tin-foil. This may be so, but it is not required that the separate details must have been original or exclusive with

the complainant seeking relief. The question is, whether the adoption of the collocated features of the plaintiff's labels, style of dress and package disclosed a differentiation from that previously adopted and by which the public has come to recognize the product of the plaintiff. If the plaintiff had assembled known features without creating dissimilarity, then, perhaps, no unfairness would be apparent in the defendants' adoption of a like dress for their product. But the evidence in this case shows that the complainant has distinguished its merchandise from that of others engaged in a similar business by the use of its distinctive label; and while the evidence on this point may not be as full to a nicety as might be expected, it is sufficient, and the defendants have not seen fit to deny it. That the defendants simulated the distinctive features of the complainant's adaptation is undeniable.

It may also be contended by the defendants that there is no proof of fraud or intentional wrongdoing. While it is necessary to prove intent to deceive, i. e., fraud, to establish a case of unfair competition, it is not necessary to prove actual deception, where there is a degree of similarity calculated to deceive the ordinary purchaser buying under ordinary conditions, because the intent to deceive may be inferred from the nature of the act. The plaintiff in this case was first in the field, and the subsequent adoption and use by the defendants of their label, substantially identical with that of the plaintiff, was unfair to the plaintiff, and we will presume, as a matter of law, that the defendants' acts were done with fraudulent intent; not because we know the actual state of the defendants' minds, but because every person is presumed to intend the natural consequences of all his acts knowingly committed. The question, therefore, is not the mental state of the defendants, but the effect of the defendants' acts on the plaintiff's business.

"It is always a question of fraud, but not necessarily of actual fraud. The act, however innocent, is considered constructively fraudulent, if the result would tend to unfair trade, to confusion of goods and to interference with the rights of another:" Manitowoc Pea Packing Co. v. Numsen & Sons, 93 Fed. Repr. 196; Nims on Unfair Competition, § 318.

It appears from the evidence that the jobbers or retailers purchasing the goods of the plaintiff were not deceived, either in the quality or the price of the goods. Therefore, it may be urged that the plaintiff is not injured. Courts of equity, looking beyond the original acts, and finding that their ultimate objects are to enable and induce the retail seller of a fraudulent imitation to palm it off on an unsuspecting public—the spurious for the genuine article—and thus contribute to the infringement upon the rights of the original owner, have not hesitated to apply the remedy: Nims on Unfair Competition, § 331. It was long ago settled, both in England and in this country, that the manufacturer is liable for unfair competition if, by the closeness of his label adopted, he puts it in the power of his retailers to mislead the purchasing consumer.

"Although all the jobbers and retailers know whose make of goods they are, yet if the retailer is able, by reason of the get-up, to use them fraudulently, the maker may be held liable to one who suffers from the retailers' unfair trading:" New England Awl and Needle Co. v. Marlborough Awl and Needle Co., 168 Mass. 154.

While we have thus far discussed, mainly, the resultant effect of the defendants' label on the plaintiff's original label of 1907, we do not lose sight of the fact that in 1913 the plaintiff modified its label by the substitution of the word "Pesco" for the picture of the cow. This substitution we do not regard as a substantial variation from the original label; all the distinctive charac-

1 D. & C.

teristics of the original remain; the use of the word "Pesco" no more created any differentiation from the original label, to the ordinary consumer, than did the insertion by the defendants of the word "Cremo" in their label create a differentiation from the plaintiff's original label. While we cannot state with absolute certainty the precise time when the defendants first adopted and used their label, it is probable, and we believe, that it was at a time after the adoption and use of the "Pesco" label, and while the plaintiff's product was still in the market under the original label. In that aspect of the case, the defendants' label is probably copied from both and would explain the use of the words "Guernsey Brand," suggestive of the cow on the original label, and the word "Cremo," in imitation of the word "Pesco" on the later one. If such be the case, the defendants' label is in similitude, not only of the original label of 1907 of the plaintiff, but also of its label of 1913, whether it be called a new label or a modified label.

The defendants have not in any material way differentiated their label from either the original or the modified label of the plaintiff, and the effect of their failure to do so puts it within the power of the retailers to deceive the public, and tends to injury to the plaintiff, confusion of the products in the market, and enables the defendants to pass off their goods as and for the goods of the plaintiff.

But the defendants urge that their label was adopted and used by them prior to the time when the plaintiff ceased using the picture of the cow and substituted the word "Pesco" therefor; hence, the defendants contend, their label could not be an imitation of the modified label of the plaintiff; and, since they were prior in adoption and use of their label, the plaintiff is not entitled to relief with respect to the modified or "Pesco" label. This suit, it must be remembered, is not for the violation of a technical trade-mark; not for an infringement of the word "Pesco" by "Cremo," but the bill is for the restraint of unfair competition, of which, it is charged, the defendants have been guilty since 1913 until the present time, by reason of the use by the defendants of a deceptive label. The label of the defendants, when adopted and used by them, was, in our opinion, intended to bring about the passing off of their inferior goods as and for the superior goods of the plaintiff. Having been so used by the defendants, its falsity will probably continue to deceive and confuse those ultimate customers, whose memory is of the original and not of the modified label. In this aspect of the case, the continued use of the spurious label will probably tend to confuse and deceive the public, irrespective of the question whether the defendants adopted their label before or after the use of the modified label of the plaintiff. Furthermore, for the reasons heretofore set forth, we do not regard the substitution of the word "Pesco" as a substantial variation of the plaintiff's original label.

On broader grounds, the question of priority urged by the plaintiff is without merit. It is true that a prior appropriation and use of a trade name, symbol, design, dress of goods, label, or other *indicia*, so associated with a trader's goods or business as to cause them to be known to the public as designating his goods or business, operates to protect him against the invasion of his good-will acquired by the celebrity of his marks. This prior appropriation and use, however, must be *bona fide;* it must be such a use as to eventuate in the association of the goods in the public mind as the goods of the trader affixing the distinctive *indicia* to them. The defendants' label was not appropriated by them in good faith, and was affixed to their product, when they adopted it, for the fraudulent purpose of palming off their inferior product on the ultimate consumer as and for the superior goods of the plain-

tiff. It was a spurious label, intended as a cheat and a fraud on the plaintiff, as well as on the public. It is certainly not the duty of the court to protect the interests of a person who has been detected in an attempt at fraud. "It would not become a court of equity to take a single step to save a party harmless, detected in a combination to cheat. No right can be deduced from an act founded in actual fraud:" Gilbert *v.* Hoffman, 2 Watts, 66.

If the defendants came before us with their bill in equity asserting prior appropriation of their label, and asking that we restrain the plaintiff from using its modified label—the facts developing as they have in this case—it would be our duty to deny them relief and to dismiss their bill, because their label is a fraud on the public and their hands are unclean. The fact that they used their false and deceptive label, under the circumstances, prior to the time of the use of the truthful, modified label of their rival trader would not avail them.

It is stated in Paul on Trade-Marks, § 87: "The test in all cases of conflict as to priority of adoption is, which claimant was first to so use the mark as to fix in the market a conviction that goods so marked had their origin with him?" The defendants in this case had, at the time of the adoption and use by the plaintiff of its modified label, been using their deceptive label, not to produce a conviction in the market that the goods to which their label was affixed had origin with them; on the contrary, their purpose was to convince the market that their labeled inferior products were the goods of the plaintiff. The defendants' use of their label, therefore, does not stand the test; they cannot, under the circumstances, avail themselves of the principles under which prior appropriations and use are protected.

Of course, if the defendants' label was adopted and used by them after the adoption and use by the plaintiff of its modified label, they are in no better position, since their label is so similar to the modified label as to render it probable that the public would be confused in the purchase of the products.

The plaintiff, it appears from the evidence, was tardy in the assertion of its rights. They knew of the defendants' use of the label in the winter of 1914, investigated and found in 1915 that the defendants' label was producing confusion or deception in the sale of the products. It is true that for a short time the defendants did not appear to be selling their goods; nevertheless, the plaintiff did not, for a considerable time after the defendants had resumed the sale of their goods, do anything to prevent the unfair competition, and did not file its bill in this case for relief until June 24, 1919. While the delay would not bar the plaintiff from injunctive relief, it is not, in our opinion, entitled to an account, and the prayer in that regard must be denied.

### Conclusions of law.

1. In trade-mark and unfair competition cases alike we have to do with the evidence of ownership or origin, and the fundamental principle underlying both is that no person may simulate the mark or label constituting such *indicia* of his rival in trade, whereby he or his vendee is enabled to practice deception by passing off his goods, directly or indirectly, as and for those of his rival in trade, and so work a fraud upon him and upon the public.

2. The resultant effect of the respective labels to confuse and mislead is to be measured and ascertained by the probable effect on purchasing consumers of the product, and not whether jobbers or retailers familiar with both products are readily able to distinguish them. It is settled law that the manufacturer is liable for unfair competition if, by the closeness of his label adopted, he put it in the power of his retailers to mislead the purchasing consumer.

1 D. & C.

P. E. Sharpless Co. v. Levin et al., trading as Levin Brothers.

3. Although intent to deceive, i. e., fraud, is necessary to be established in cases of unfair competition, it is not necessary to prove actual deception, where there is a degree of similarity calculated to deceive the ordinary purchaser buying with ordinary caution, because the intent to deceive may be inferred from the nature of the act.

4. The defendants, in the adoption and use of their label (Exhibit "B") in simulation of the plaintiff's label, were guilty of intent to deceive the ordinary purchaser buying with ordinary care.

5. The defendants were guilty of unfair competition.

6. The defendants, their servants, agents and employees, should be perpetually enjoined from using the label (Exhibit "B") in its present form, or in any form or manner in simulation of the plaintiff's label (Exhibit "A").

7. The plaintiff was tardy in its application for relief and is not entitled to an account from the defendants.

8. The defendants should pay the costs.

9. Counsel to prepare and present a form of decree.

Jan. 23, 1922, the court in banc, by MARTIN, P. J., dismissed exceptions and entered the following

*Decree.*

This cause having heretofore come on for trial on the pleadings, and proofs adduced in open court, and thereafter upon defendant's exceptions to findings of fact and conclusions of law contained in the opinion of the court heretofore filed, granting the prayers of the bill of complaint in the respects hereinafter stated, it is now, this 23rd day of January, 1922, after due consideration thereof, ordered, adjudged and decreed as follows:

1. That said exceptions be and are hereby dismissed, and the aforesaid findings of fact and conclusions of law confirmed.

2. That the use by the defendants of their label (Exhibit "B") as charged in the bill of complaint was and is in unfair competition with plaintiff's label (Exhibit "A") as charged in the bill, and to the injury of the plaintiff in its good-will and established trade created thereby.

3. That a perpetual injunction issue, enjoining and restraining the defendants, Morris Levin, Jacob Levin, Oscar Levin and Joseph Levin, all or some of whom trading as Levin Brothers, and each and every of them, their servants, agents and employees, from any further use by them, or any of them, on packages of so-called Neufchatel cheeese, of their trade label (Exhibit "B"), annexed to the bill of complaint, or any other substantially similar thereto, and from any further use on such goods of any label substantially similar to the plaintiff's label (Exhibit "A") as a whole, and particularly as respects the simulation thereof in the use by defendants on their said label (Exhibit "B") of the words "Cremo," "Neufchatel Style," "Made Daily in Pennsylvania," and the collocation and arrangement thereof as shown in said Exhibit "B."

4. That an accounting for past profits and damages, by said defendants, for the tort herein adjudged, and the recovery thereof by plaintiff, is denied for the reasons set forth in said findings.

5. That plaintiff recover its costs of suit, usual and proper to be taxed in the cause, and have judgment therefor.